OPINION
{¶ 1} Defendant-appellant Elvis Wooten appeals his conviction and sentence entered by the Stark County Court of Common Pleas, on one count of complicity to aggravated robbery and one count of complicity to aggravated burglary, following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On December 27, 2007, the Stark County Grand Jury indicted Appellant on one count of complicity to aggravated murder, in violation of R.C. 2923.03(A)(1) and (A)(2) and R.C. 2903.01(B); one count of complicity to aggravated robbery, in violation of R.C. 2923.03(A)(1) and (A)(2) and R.C. 2911.01(A)(1); one count of complicity to aggravated burglary, in violation of R.C. 2923.03(A)(1) and (A)(2) and R.C. 2911.11(A)(2); and one count of complicity to aggravated kidnapping, in violation of R.C. 2923.03(A)(1) and (A)(2)and R.C. 2905.01(A)(2). Each count carried a firearm specification. Appellant entered a plea of not guilty to the Indictment at his arraignment on December 28, 2007.
 {¶ 3} The matter proceeded to jury trial, commencing on March 31, 2008. The following evidence was presented at trial. *Page 3 
 {¶ 4} Appellant and his girlfriend, Shauntia Earley, moved into the Chips Townhouses in Canton, Ohio, in May, 2007. During the following months, Appellant met a number of individuals who lived close by and frequented Earley's apartment. Appellant began to associate with Zabe Jenkins, Michael Hall, Raymond Byrd, Chevon Jackson, and LaToya Rutledge in May, and June, 2007. During this same time period, Appellant purchased marijuana 2-3 times a week from Antwon Hight and Steven Hight, Jr. The Hight boys lived with their father, Steven Hight, Sr., in a house located a short distance from the Chips Townhouses. Appellant went to the Hight home either alone or with Jenkins or Rutledge. On some of these occasions, Hight, Sr., was present. Through his marijuana purchases, Appellant became friendly with the Hight brothers and learned of their habit of going fishing at night. The Hight boys knew Wooten only as "Kwan."
 {¶ 5} Sometime around June 11, 2007, Appellant began planning a burglary of the Hight home to steal the marijuana he knew the brothers had there. Appellant talked to Chevon Jackson about his plan and encouraged her to go along with him. Appellant told Jackson there was about 2 pounds of marijuana in the house, and the job would be easy. He explained to Jackson the man who lived at the residence would be alone because his sons would be fishing. Although Jackson initially considered Appellant's proposal, she ultimately did not participate in the events that followed.
 {¶ 6} On June 20, 2007, Appellant approached Michael Hall about his plan. He told Hall they could make some quick money through the burglary. The two planned to meet later that evening at Appellant and Earley's apartment, and then proceed to the Hight home. *Page 4 
 {¶ 7} After dark that evening, Raymond Byrd received a phone call from Zabe Jenkins asking him to come over to Appellant and Earley's apartment. Byrd walked over, bringing a shotgun with him. When Byrd arrived at the apartment complex, he, Appellant, and Jenkins went inside. Appellant informed the two men of the location of the marijuana in the Hight residence, and advised them the occupants would be away on a fishing trip. Jackson was also at the apartment, and heard this conversation. Jackson recalled Appellant with a silver Ruger P89 semiautomatic handgun, which she had seen him carry on more than ten prior occasions. She also heard Appellant tell the others if anything went wrong, "Hondo", as Hight, Sr., was known, was a dead man.
 {¶ 8} Hall arrived a short time later, meeting Byrd, Jenkins and Appellant in the parking lot of the Chips Townhouses. He noticed Jenkins had a handgun and Byrd had a shotgun. Hall recognized the handgun Jenkins carried as one he had seen Appellant carry. After Hall, Jenkins and Byrd donned themselves in all black clothing — ski masks, bandanas and gloves, Appellant called for a ride. A few minutes later, LaToya Rutledge appeared, driving a silver four-door Pontiac. Hall, Jenkins, Byrd and Appellant entered the vehicle and Rutledge drove them to a location two blocks away from the Hight residence. Appellant and Rutledge stayed near the car while Byrd, Hall and Jenkins walked to the Hight home. Byrd knocked on the door. When Hight, Sr., answered, Hall and Jenkins rushed into the house. Byrd followed and pointed the shotgun at Hight, Sr. Jenkins put Hight, Sr., on the sofa, and ordered the man to cover his head with a blanket. Jenkins gave the Ruger handgun to Hall. Hall guarded Hight, Sr., while Byrd and Jenkins ransacked the house. *Page 5 
 {¶ 9} Byrd went into a bedroom, searching everywhere for marijuana and money. When he exited the bedroom, Byrd saw Jenkins in the bathroom with Hight, Sr. Jenkins had bound the man's wrists and ankles with duct tape. Jenkins was still in possession of the Ruger handgun. Byrd looked under the sink in the bathroom and found marijuana. Byrd, Hall and Jenkins were ready to leave the house when they heard a knock at the front door. Jenkins and Byrd decided to rob whoever was at the door and yelled to the person knocking to go to the side door.
 {¶ 10} Byrd, Hall, and Jenkins then exited though the front door. Byrd and Jenkins told Hall to return to the car. As Ryan Rider, the man who had been knocking on the front door, made his way to the side door as directed, Byrd crept up behind him, trained the shotgun on his head, and ordered him to walk toward the back of the house. Meanwhile, Jenkins went to the passenger side of the car in which Rider had arrived. Hight, Sr.'s brother, Bob, was in the passenger seat. Rider glanced back and saw Jenkins pointing a gun at Bob.
 {¶ 11} As Byrd walked Rider at gunpoint to the rear of the house, Hight, Sr., charged out of the side door, brandishing a knife. Hight, Sr., grabbed the barrel of Byrd's shotgun, causing the weapon to discharge into the roof of the carport. Hight, Sr., wrestled the shotgun away from Byrd. Hight, Sr., attempted to pump the weapon and Byrd fled. Rider headed toward a neighbor's house in order to get help. Before he could knock on anyone's door, he heard footsteps and observed two black males running up the street. Rider ducked down beside a house, but the men discovered him. One of the black males with a handgun ordered Rider to run in the opposite direction, which he did. The male fired three shots at Rider as he fled. *Page 6 
 {¶ 12} In the meantime, Hall returned to Rutledge's car. Hall believed he heard four or five gunshots before Jenkins and Byrd appeared. Jenkins was the last to arrive at the car. Thereafter, everyone entered the vehicle, and Rutledge drove them back to the Chips Townhouses. Rutledge received a portion of the marijuana for her services.
 {¶ 13} Jackson was still at Earley's apartment when Appellant and Jenkins returned. She heard Appellant say they had to dispose of the gun. Appellant and Jenkins proceeded upstairs. Later, Appellant and Jenkins came downstairs, each with roughly one-half pound of marijuana. Approximately one week after the murder, Appellant was intoxicated and commented to Jackson, "[Jenkins] was an idiot and didn't have to shoot him like that. There were so many of them, they could have got away even if [Hight, Sr.] got his hands on the gun." Trial Transcript, Vol. I, at 232.
 {¶ 14} Canton Police Officers Robert Smith and Ryan Davis as well as two other officers were dispatched to the Hight residence shortly after midnight on June 21, 2007, in response to reports of shots fired. The officers arrived to find Hight, Sr., dead, lying in a pool of blood on the driveway. They observed duct tape on the decedent's left wrist and right ankle, a shotgun next to his left hand, and a steak knife on the steps of the house.
 {¶ 15} Officer Kevin Clary of the Canton Police Department Crime Scene Unit responded to the Hight residence in order to process the scene. When Clary arrived, he discovered three shell casings from a .9mm weapon on the driveway. The shotgun which was next to Hight, Sr.'s body contained one spent round and five live rounds. From the driveway, Clary also recovered a digital scale, a red and black Fila tennis shoe, and a bag containing two small baggies of marijuana. Clary found the interior of *Page 7 
the home in complete disarray; drawers were pulled out of dressers, furniture was damaged, and cushions were removed from the sofa.
 {¶ 16} During the daylight hours of June 21, 2007, Crime Scene Unit Officer Jeffery Ramser reported to the Hight residence and searched the scene using a metal detector. Ramser found another .9 mm shell casing in the grass next to the driveway. Ramser and Detective Victor George also searched around 21st Street, NW, and Edwards Street, in the area in which shots had been fired at Rider. Police officers recovered three .9 mm shell casings from that location.
 {¶ 17} Dr. P. S. S. Murthy performed an autopsy of Hight, Sr.'s body. The autopsy revealed Hight had been shot three times; once in the forehead, once in the upper left chest, and once in the mid-back. Dr. Murthy reported the shots to Hight, Sr.'s forehead and left chest were fatal injuries, and the shot to his mid-back was potentially fatal. All three bullets remained in Hight, Sr.'s body. Dr. Murthy extracted the bullets and sent them to the Canton-Stark County Crime Lab for analysis. Dr. Murthy ruled the manner of death as homicide.
 {¶ 18} Michael Short of the Canton-Stark County Crime Lab examined four shell casings found outside the Hight home, three shell casings from the area near 21st Street, NW, and Edwards Street where shots had been fired, and the bullets recovered from Hight, Sr.'s body. Short concluded the seven shell casings and the three bullets, which were .9mm caliber, were fired from the same weapon.
 {¶ 19} Based upon his findings and at the request of investigators, Short compiled a list of firearms which could have discharged the bullets and shell casings. The possible manufacturers of weapons, which could generate the rifling characteristics *Page 8 
Short discovered on the bullets, included Ruger, Norinco, Ceska Zbrojovka, Tanfoglio, SWD, and Wather. Short also entered the information from his examination of the shell casings — firing pin impression and breach face marks — into NIBIN.[1] Per NIBIN, the marks on the shell casings were more characteristic of a Ruger firearm than any of the other firearms on the list. Short learned Ruger manufactures a .9 mm handgun, called the P89, which has a brushed stainless finish.
 {¶ 20} Canton Police Detective Victor George investigated the homicide. During his investigation, Det. George learned the direction in which the men had fled from the scene. The detective canvassed the area and found a witness who had observed a gold 4-door Pontiac Grand Am parked 2 blocks away from the Hight home around the time of the murder. Det. George examined the area where the witness indicated the car had been parked. The location was under two streetlights, one a sodium vapor light and the other a cellular vapor light. The detective explained either type of streetlight would cast an orange or amber illumination which would make a silver car appear gold or tan.
 {¶ 21} After talking with the Hight brothers, Det. George developed a short list of two potential suspects: William Simmons, and a man known to the Hights as "Kwan". Kwan was described as African American, short, with a distinctive voice and hair done in dread locks. The detective also learned Kwan's girlfriend lived off of 33rd Street, NE, and drove a red Jeep Cherokee.
 {¶ 22} Det. George pinpointed an address for Kwan's girlfriend. He repeatedly patrolled the area until eventually he observed a woman in a red Jeep Cherokee, *Page 9 
leaving the residence. He conducted a traffic stop and identified the driver as Summer Wilder. Det. George told Wilder he needed to talk to Kwan about a robbery and homicide which had occurred the previous week. Wilder informed the detective Kwan was living at the Chips Townhouses, and his given name was Elvis Wooten. Det. George instructed Wilder not to contact Appellant.
 {¶ 23} The detective left Wilder and proceeded directly to the Chips Townhouses and to Earley's apartment. When Det. George and his partner, Officer James Daniel, approached, they observed a man in front of the apartment who matched Appellant's description. Appellant was talking on a cell phone. The officers were driving unmarked cars, and were in plain clothes, however, when they drove into the area, Appellant stood up and walked inside the apartment. Det. George directed Officer Daniel to go around back. As Det. George headed to the front door, Appellant charged out the back door.
 {¶ 24} Officer Daniel gave chase and apprehended Appellant a short distance away. Later, at the Canton Police Department, Appellant was questioned about the homicide, but denied any knowledge of it. Appellant did admit, however, he knew the Hight family, had purchased marijuana from the Hight brothers, and had smoked marijuana with them.
 {¶ 25} Det. George also spoke to Earley, who provided the detective with the street names of Hall, Jenkins, and Jackson. The detective spoke with Hall, Jenkins, and Jackson on more than one occasion, however, they initially were not candid in their disclosures. Det. George eventually determined Rutledge was the driver of the car, and had transported Hall, Jenkins, Byrd and Appellant to the area near the Hight residence. Det. George was able to eliminate William Simmons as a suspect. Later in the *Page 10 
investigation, Det. George located the silver Pontiac Grand Am, and discovered the vehicle was registered to Rutledge's mother.
 {¶ 26} Jackson, Hall and Byrd all implicated Appellant as the individual who orchestrated the events which occurred at the Hight home.
 {¶ 27} After hearing all the evidence and deliberations, the jury acquitted Appellant of complicity to aggravated murder, complicity to aggravated kidnapping, and the four firearm specifications. The jury found Appellant guilty of complicity to aggravated robbery and complicity to aggravated burglary. The trial court subsequently sentenced Appellant to a term of imprisonment of ten years on each count, and ordered the terms to be served consecutively.
 {¶ 28} It is from this conviction and sentence Appellant appeals, raising the following assignments of error:
 {¶ 29} "I. THE APPELLANT WAS DENIED HIS RIGHT TO TRIAL BY AN IMPARTIAL JURY.
 {¶ 30} "II. THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 31} "III. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
 {¶ 32} "IV. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I *Page 11 {¶ 33} In his first assignment of error, Appellant contends he was denied his right to trial by a fair and impartial jury when the trial court dismissed Juror 28 for cause, and declined to conduct a hearing pursuant to Remmer v. United States (1954), 347 U.S. 227, 74 S.Ct. 450,98 L.Ed. 654.
 {¶ 34} Due process requires a person accused of a crime shall be tried before a panel of fair and impartial jurors. Duncan v. Louisiana (1969),391 U.S. 145, 153, 88 S. Ct. 1444, 1449, 20 L.Ed2d 491. However, "a new trial will not be necessary every time a question of juror partiality is raised. Where a colorable claim of extraneous influence has been raised, however, a Remmer hearing must be held to provide the defendant an opportunity to establish actual bias." United States v. Herndon, 156 F.3d 629, 635, 49 Fed.R.Evid. Serv. 1551, 1998 Fed.App. 0274P.
 {¶ 35} In Remmer, the United States Supreme Court set forth the procedure for addressing alleged communications or contacts with jurors during a criminal trial: "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Remmer, supra at 229 (Citations omitted).
 {¶ 36} Prior to commencing trial on the second day of trial, and outside the presence of the jury, the trial court informed counsel Juror 28 had raised some concerns *Page 12 
to the court. Juror 28 indicated he recognized one of the previous day's witnesses, as well as individuals seated in the gallery, and that his wife was pregnant, and he wished to be excused. After advising counsel of the concerns, the trial court brought Juror 28 into the courtroom. Juror 28 elaborated he was a teacher and coach at McKinley High School and recognized a witness from the previous day through his duties as a teacher and coach. He expressed concern for the safety of his family explaining, ". . . these people know my name. They know who I am. They know where I work." Juror 28 admitted these factors would interfere with his ability to give the trial his full attention; therefore, he did not want to continue as a juror. The trial court spoke privately with the prosecutor and defense counsel and asked if either had any objection to the court's excusing Juror 28 for cause. The prosecutor and defense counsel did not state any objection or request further inquiry of Juror 28.
 {¶ 37} In support of his position the trial court was required to conduct a Remmer hearing, Appellant cites United States v. Davis, 177 F.3d 552, 1999 Fed.App. 0184P, in which the United States Court of Appeals for the Sixth Circuit addressed the issue of whether a trial court should conduct a Remmer hearing in a case of alleged juror misconduct. In Davis, a juror requested he be removed from service out of fear of retaliation. The Davis juror did not discreetly bring his concerns to the attention of the trial court, but instead stood up in open court and "requested to be excused from deciding the fate of the defendants." Id. at 556. The trial court subsequently questioned the juror who acknowledged he had shared his concerns with the other member of the jury. Id. We find Davis to be distinguishable from the case sub judice. In the instant action, there is no evidence of similar juror conduct. Furthermore, in order to have a *Page 13 
valid claim in a Remmer situation, a defendant must show actual prejudice. State v. Hessler, 90 Ohio St.3d 108, 121, 2000-Ohio-30
(Citations omitted). Appellant does not affirmatively demonstrate how he has been prejudiced by the trial court's failure to conduct aRemmer hearing. The record does not evidence Juror 28 shared his concerns with any other juror. Unlike Davis, Juror 28's disclosure was not made in open court in the presence of the other jurors.
 {¶ 38} Appellant did not object to the trial court's failure to conduct a Remmer hearing. Appellant also failed to object to the dismissal of Juror 28. Accordingly, Appellant has waived all but plain error. State v. McKnight, 1007 Ohio St.3d 101, 2005-Ohio-6046 at ¶ 185. Pursuant to Crim. R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Cooperrider (1983),4 Ohio St.3d 226, 448 N.E.2d 452. An alleged error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Stojetz, 84 Ohio St.3d 452, 455,1999-Ohio-464. The burden of demonstrating plain error is on the party asserting it. Appellant herein has failed to satisfy his burden. Appellant does not present any record evidence which establishes the alleged error changed the outcome of his trial. In fact, the jury's acquittal on the counts of complicity to aggravated murder and complicity to kidnapping belies his position.
 {¶ 39} Appellant's first assignment of error is overruled.
 II *Page 14 {¶ 40} In his second assignment of error, Appellant raises a claim of ineffective assistance of counsel.
 {¶ 41} The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 42} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St.3d at 142,538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 43} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing there is a reasonable probability but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
 {¶ 44} Appellant predicates his assertion on defense counsel's failure to request the trial court conduct further inquiry of Juror 28, and failure to file a motion for a new trial based upon juror misconduct. Assuming, arguendo, counsel's representation fell *Page 15 
below an objective standard of reasonableness, we find Appellant has failed to established he was prejudiced by such ineffectiveness in the record now before us. The trial court conducted a brief inquiry of Juror 28, and found the juror's concerns warranted excusing him for cause. As discussed in Assignment of Error I, supra, the trial court was not required to conduct a Remmer hearing. Appellant has not demonstrated the jury was prejudicially tainted by Juror 28's disclosures. Therefore, Appellant has not demonstrated the outcome would have been different but for defense counsel's failures.
 {¶ 45} Appellant's second assignment of error is overruled.
 III {¶ 46} In his third assignment of error, Appellant maintains he was denied his right to a fair trial due to prosecutorial misconduct.
 {¶ 47} Determining whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and (2), if so, whether the remarks prejudicially affected the accused's substantial rights. State v. Tenace (2006), 109 Ohio St.3d 255,847 N.E.2d 386, citing State v. Smith (1984), 14 Ohio St.3d 13, 14,14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. Treesh (2001),90 Ohio St.3d 460, 464, 739 N.E.2d 749. *Page 16 
 {¶ 48} In addition, the challenged comments of the prosecutor are reviewed in the context of the entire trial. This review thus necessitates a review of the evidence and its strengths and weaknesses relative to the defendant's guilt, as well as any corrective measures, such as curative instructions, taken by the trial court. State v.Cunningham, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 86 ("Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."); State v. Keenan,66 Ohio St.3d at 410, 613 N.E.2d at 209 ("We consider the effect the misconduct had on the jury in the context of the entire trial. * * * One factor relevant to the due-process analysis is whether the misconduct was an isolated incident in an otherwise properly tried case.")
 {¶ 49} Appellant's complaints surround the following portion of the State's cross-examination of Shauntia Earley:
 {¶ 50} "PROSECUTOR: Shauntia, the truth is when you told Sergeant George the first time you didn't know anything, that was [sic] the truth. Isn't that right?
 {¶ 51} "SHAUNTIA EARLEY: Yes, I did know.
 {¶ 52} "PROSECUTOR: Said Toya [Rutledge] was there in your apartment that night, also?
 {¶ 53} "SHAUNTIA EARLEY: Yes, she was.
 {¶ 54} "PROSECUTOR: You know now that Toya has confessed to being the driver of that car, isn't that right?
 {¶ 55} "DEFENSE COUNSEL: Oh, objection, mistrial."
 {¶ 56} T(III) at 671-672. *Page 17 
 {¶ 57} The trial court called counsel to sidebar. The prosecutor maintained Det. George testified Rutledge was identified as the driver. Defense counsel noted Det. George never testified Rutledge confessed. The trial court reserved ruling on Appellant's request for a mistrial until the following day and directed counsel to proceed. Neither party had any further questions for Earley and the defense rested. The court then gave the following instruction to the jury:
 {¶ 58} "THE COURT: I know that there was a stir in the courtroom when counsel made an objection and asked for a mistrial relative to a statement made by — a question asked by the Prosecutor concerning the other individual that is alleged that by some to have been in the car; and I am instructing you now to disregard the question and the answer.
 {¶ 59} "That is not relevant to your decisions with regard to any involvement by this particular Defendant in this case. So disregard that question and any answer that was given as it relates to that."
 {¶ 60} T(III) at 683-684
 {¶ 61} The court then recessed until the following morning when it ruled on Appellant's motion for a mistrial:
 {¶ 62} "THE COURT: The Court has had an opportunity to hear the arguments and also to deliberate with regard to this motion.
 {¶ 63} "Specifically, the transcript of the question and answer — the question would reflect that the exact question was, by Mr. Vance said `Toya was there in your apartment that night also' the answer, `Yes, she was.' *Page 18 
 {¶ 64} "`You know now that Latoya has confessed to being the driver of that car, isn't that right'
 {¶ 65} "Objection, the motion for the mistrial
 {¶ 66} "So the objectionable question, `You know now that Toya has confessed to being the driver of that car, isn't that right,' that fact, the fact of the confession by Toya was not in evidence at the time the question was posed.
 {¶ 67} "Had she responded `No, I don't know,' the State would not have been in a position to bring in extrinsic evidence of the facts of the confession.
 {¶ 68} "There is no question but that the State had a good faith knowledge or understanding that there was, had been a confession.
 {¶ 69} "The court does not look at the fact of the statement that there had been a confession to being the driver as being a statement which denies the defense of confrontation in terms of the Sixth Amendment.
 {¶ 70} "It is a statement or fact that was used for impeachment purposes to show inconsistency between what was being stated by a witness and what fact was in fact in existence.
 {¶ 71} "The Court has gone the extra step, probably further than the Court needed to go, in sustaining the objection and giving the curative instruction to the jury to ignore the question and answer.
 {¶ 72} "Clearly, the Court does not find that this was a statement by a Co-Defendant implicating, or any witness, implicating the Defendant that would be inappropriate. *Page 19 
 {¶ 73} "To the extent that the jury infers that the alibi witness is less than truthful, that was the exact purpose of the reason for the question in the first place.
 {¶ 74} "They are entitled to impeach witnesses called by the State based on inconsistent statements made in the past.
 {¶ 75} "Further, the Court did give a curative instruction.
 {¶ 76} "Lastly, the question in and of itself, the jury has already been instructed is not evidence; and the question was not answered.
 {¶ 77} "For all those reasons, the Court finds that No. 1, there wasn't any misconduct on the part of the State of Ohio.
 {¶ 78} "No. 2, to the extent there was any mistake made, it was overly cured by the instruction given to the jury.
 {¶ 79} "And, thirdly, there was absolutely no prejudice to the defendant as a result of that.
 {¶ 80} "Accordingly, the Court overrules the motion for mistrial."
 {¶ 81} T(IV) at 700-703.
 {¶ 82} The trial court found the Prosecutor had a good-faith belief a factual predicate for the question existed. Nothing in the record affirmatively demonstrates otherwise. Det. George testified that Rutledge was identified as the driver and Appellant had been provided with Rutledge's confession during discovery. T (II) at 539-540 and T (V) at 699.
 {¶ 83} Assuming, arguendo, the Prosecutor's question was improper, we find Appellant cannot show prejudicial error. The trial court sustained the objection and gave a curative instruction. A jury is presumed to follow the curative instructions of the *Page 20 
court. State v. Garner (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623,634; State v. Loza (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100. The confession of Rutledge she drove Appellant and the others to and from the Hight home does not go to the underlying offenses with which Appellant was charged. The jury had ample evidence before it to find beyond a reasonable doubt Appellant did, in fact, aid, abet and solicit Hall, Jenkins, and Byrd to commit aggravated robbery and aggravated burglary even without Rutledge's confession. Finally, this is only one incident of alleged misconduct in a trial which occurred over a four day period. If indeed the question constituted misconduct, it was an isolated incident in an otherwise properly tried case.
 {¶ 84} Appellant's third assignment of error is overruled.
 IV {¶ 85} In his final assignment of error, Appellant challenges his convictions as against the sufficiency and manifest weight of the evidence.
 {¶ 86} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus. *Page 21 
 {¶ 87} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 678 N.E.2d 541, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 88} Appellant was convicted of soliciting, procuring, aiding or abetting another in committing aggravated robbery and aggravated burglary. In order to convict Appellant, the State needed to prove he solicited, aided or abetted Hall, Byrd, and Jenkins in trespassing into the occupied Hight residence by force, stealth or deception in order to commit a theft offense while the men had deadly weapons under their control, and the men displayed, brandished or used the weapons. R.C. 2923.03, R.C. 2911.11(A)(2) and R.C. 2911.01 (A)(1).
 {¶ 89} In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. A person aids or abets another when he supports, assists, encourages, cooperates with, advises or incites the principal in the commission of the crime and shares the criminal intent of the principal. State v. *Page 22 Johnson (2001), 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796, 801. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed". Id. at 246.
 {¶ 90} Appellant does not argue the State failed to prove any one element of either crime. Rather, Appellant's arguments focus on inconsistencies in the testimony of the State's witnesses, and inconsistencies in their individual statements given to police, the grand jury, and at trial. Appellant also questions the credibility of the State's witnesses. As set forth in our Statement of the Case and Facts, the testimony at trial established Appellant took an active role in causing the commission of the aggravated burglary and aggravated robbery at the Hight home. Appellant frequently purchased marijuana from the Hight brothers, and through these transactions, gained knowledge of their habits and routines. With this knowledge, he began recruiting others to burglarize the home and steal marijuana he knew was located therein, during a time when he was aware the occupants would likely be absent, or Hight, Sr., would be alone.
 {¶ 91} Hall and Jackson both testified Appellant approached them about his plan to burglarize the Hight home, and told them they could make some fast money doing a quick "lick" or robbery. Appellant informed Hall and Jackson the job would be easy because the people who lived there would be away fishing. Hall testified he, Jenkins, Byrd and Appellant met later that evening to carry out the crimes. Jackson was also present when Appellant discussed the job with Jenkins and Hall. She observed Appellant and Byrd with guns. Appellant carried a silver .9 millimeter Ruger P89, which Jackson and Hall had observed Appellant carrying on a number of previous occasions. *Page 23 
Appellant advised Jackson if anything went wrong with the job, Hight, Sr., was a "dead man."
 {¶ 92} Byrd testified Appellant spoke with him and Jenkins about carrying out the robbery when the three men were at Earley's apartment. Byrd saw Jenkins with a silver Ruger P89 handgun, which he believed was the same gun he had seen Appellant carry in the past. Appellant directed Byrd and Jenkins to the location of the marijuana in the Hight residence. Appellant traveled with them to a location near the Hight house and stayed near the getaway car. After the job was complete, Appellant received a portion of the marijuana Byrd found under the bathroom sink in the Hight house.
 {¶ 93} We find the testimony of these witnesses was sufficient to establish Appellant orchestrated the events which occurred at the Hight residence. Further, Appellant was not only aware the men took two firearms with them, but also directed them to use the firearms if necessary. Appellant arranged for transportation to and from the crime scene and shared in the spoils of the crime.
 {¶ 94} Appellant also takes issue with conflicting testimony regarding whether a white female or a black female drove the car. Appellant points to Hall's initial statement to police in which Hall stated the driver was white, and his trial testimony the driver was black. Appellant further complains Jackson did not reveal who the driver was until Appellant's girlfriend implicated her; and Hall and Byrd testified against him in order to receive 15 year sentences and a promise the State would not pursue murder charges against them.
 {¶ 95} It is well settled minor inconsistencies in the testimony of witnesses do not render a conviction against the manifest weight of the evidence. A jury may "take note *Page 24 
of the inconsistencies and resolve or discount them accordingly." It is equally well settled the issue of credibility is primarily a matter for the trier of fact to determine since the trier of fact is in the best position to judge the credibility of witnesses and the weight to be given the evidence.
 {¶ 96} As discussed, supra, the identity of the driver of the car had no bearing on the jury's determination of whether or not Appellant solicited Hall, Jenkins and Byrd to commit aggravated robbery and aggravated burglary. Further, defense counsel extensively questioned these witnesses about their inconsistent statements as well as any motivation they may have had for self-interest.
 {¶ 97} Additionally, Appellant argues the State's witnesses could not agree on the origin of the guns, and the evidence did not connect him to the attempted robbery of Robert Hight, Sr., and Ryan Ryder. Both arguments are moot. The jury acquitted Appellant of the four gun specifications, and the complicity to murder and complicity to kidnapping charges. Appellant was not charged with any crime against Ryan Rider. Also, even if the handgun did not belong to Appellant, the testimony established he was aware Jenkins and Byrd were armed when they enter the Hight home at his request, and he had directed the men to use the weapons if anything went wrong.
 {¶ 98} Based upon the foregoing and the entire record in this matter, we find Appellant's conviction was neither against the manifest weight nor the sufficiency of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before it given they acquitted Appellant of the most serious crimes against him.
 {¶ 99} Appellant's fourth assignment of error is overruled. *Page 25 
 {¶ 100} The judgment of the Stark County Court of Common Pleas is affirmed.
Hoffman, P.J., Edwards, J., and Delaney, J., concur.
 JUDGMENT ENTRY *Page 26 
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to Appellant.
[1] NIBIN is the National Integrated Ballistic Information Network, a national searchable ballistics database. *Page 1