UNITED STATES of America,
Plaintiff–Appellee,

v.

William Julian HERNDON,
Defendant–Appellant.

No. 97–5254.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1998.

Decided Sept. 2, 1998.

Terry M. Cushing, Asst. U.S. Attorney (briefed), James A. Earhart, Asst. U.S. Attorney (argued and briefed), Office of U.S. Attorney, Louisville, KY, for Plaintiff–Appellee.

Elgin L. Crull (argued and briefed), Crull & Crull, Louisville, KY, for Defendant–Appellant.

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

William Julian Herndon appeals from his jury conviction on one count of conspiracy to possess with intent to distribute cocaine, three counts of possession with intent to distribute cocaine, two counts of aiding and abetting the distribution of cocaine, and one count of carrying a firearm during and in relation to a drug-trafficking crime. On appeal, Herndon argues that the district court erred in not permitting his attorney to question a juror who recalled during jury deliberations that he may have had prior business dealings with Herndon. He also contends that the district court erred by allowing the statements of his alleged co-conspirators to be admitted into evidence. Finally, Herndon claims that the evidence offered at trial was insufficient to prove beyond a reasonable doubt that he conspired to distribute cocaine,

aided and abetted in the distribution of cocaine, and carried a firearm during a drug-trafficking crime.

For the following reasons, we AFFIRM the rulings of the district court relating to the admission and sufficiency of the evidence, but VACATE Herndon's conviction and sentence, and REMAND the case for a hearing to determine if Herndon was prejudiced by the juror's belated acknowledgment that he may have had prior dealings with Herndon. If prejudice is found, then Herndon is entitled to a new trial. If no prejudice is found, then the district court should reinstate Herndon's conviction and sentence.

## I. BACKGROUND

In the summer of 1994, the Kentucky State Police, in cooperation with the Federal Bureau of Investigation, began an undercover investigation into the possible distribution of cocaine through the Roadhouse Bar ("Roadhouse") located in Bullitt County, Kentucky. They suspected that Herndon, the proprietor of the bar, was involved in the drug trafficking. After commencing their investigation, the state officers came to believe that Dan Bailey was also distributing cocaine and using the Roadhouse as a base of operations.

Officers Wayne Hedgespeth and Daniel Triplett conducted the investigation. Hedgespeth and Triplett first met Bailey on August 8, 1994, when they purchased one ounce of cocaine from Bailey in exchange for $1,900. After the first transaction, the officers agreed to meet Bailey on August 18, 1994 at the Roadhouse. When they arrived, Bailey was leaning against the far wall. Upon seeing the officers, Bailey whispered to a Roadhouse employee, Neil Williams. Williams made a phone call and then whispered back to Bailey. Bailey approached the officers and informed them that the cocaine was "on its way." A few minutes passed, and then Herndon entered the Roadhouse through the back entrance. Bailey and Herndon went into the kitchen. Bailey then returned to the table where the officers were sitting and said, "It's here whenever you want to do it." Bailey and the officers proceeded to the rear parking lot. Bailey walked over to a pickup truck and retrieved a plastic bag. The officers exchanged $3,800 for the bag, which was filled with two ounces of cocaine.

The next meeting occurred on August 23, 1994. When the officers arrived in Bullitt County later that day, after receiving a page from Bailey, they called him about obtaining tickets to a boxing match that Bailey was promoting in Louisville, Kentucky. During the call, Bailey asked if they needed "a couple ounces" of cocaine. The officers responded by telling Bailey that they were headed to the Roadhouse. When they arrived at the Roadhouse, Hedgespeth recalls Herndon approaching them and saying that "he didn't know that [they] were coming, and that it would be 8:00 p.m. before [they] could do anything." Bailey arrived a little while later. He approached the officers and informed them that the "stuff" would not be available for an hour. Hedgespeth responded by informing Bailey that Herndon had already told them. Bailey did not reply to Hedgespeth's comment. The officers purchased tickets to the fight promoted by Bailey, left the bar, and then returned around 8:30 p.m. Upon returning to the bar, Bailey handed Hedgespeth a plastic bag filled with one ounce of cocaine. Hedgespeth went into the bathroom and counted out $1,900, which he handed to Bailey.

The officers returned to the Roadhouse on September 13, 1994. Herndon approached the officers and asked if they had seen Bailey since they were in town. The officers responded that they had not seen Bailey, but he knew that they were coming. Herndon gave them Bailey's telephone number. The officers intentionally dialed an incorrect telephone number, but told Herndon that they could not connect with Bailey. Herndon said, "Well, I hate for you all to make a trip for nothing," and then asked the officers "how many [they] wanted." Hedgespeth told Herndon that they would take one ounce. Herndon showed them a sample and requested that they "front" the $1,900. The officers agreed to the arrangement, but expressed concerns over angering Bailey. Herndon replied that the officers should not worry because "he was dealing with Dan [Bailey]." (During Hedgespeth's earlier testimony, he

recalled that Herndon stated that "he was taking care of Dan [Bailey]"). They arranged to meet later at Gobel's Tavern ("Gobel's") to exchange the drugs. Hedgespeth and Triplett arrived early at Gobel's. Triplett temporarily left to go to their car. While there, he saw Herndon in the parking lot. Herndon gave Triplett the cocaine, and Triplett passed it to Hedgespeth.

The next encounter occurred on October 19, 1994. The officers went to the Roadhouse looking for Herndon. They waited for Herndon to arrive, and then asked him if any cocaine was available. Herndon agreed to supply the cocaine, but said he needed the money prior to delivery. The officers gave Herndon $1,900 and agreed to meet him later that evening. The officers met Herndon at Gobel's. Herndon asked Hedgespeth to reconvene outside next to his truck. Herndon handed Hedgespeth a plastic bag with what appeared to be one ounce of cocaine. After the transaction was completed, Herndon removed a fully loaded Glock nine millimeter handgun from his waistband, and said "I guess I won't be needing this now." Around the same time, Triplett came outside and approached the truck. Herndon handed the handgun to Hedgespeth and said "It was for nosey people." Hedgespeth examined the gun, passed it to Triplett, and then Herndon placed the gun back in his waistband.

The final meeting occurred on November 7, 1994. On that date, the officers met with both Herndon and Bailey. Initially Bailey proposed to sell marijuana to the officers. After the officers expressed doubt about purchasing the marijuana, they indicated an interest in procuring cocaine. Bailey and Herndon then left the table and met in the kitchen area. Bailey motioned to Hedgespeth to join them in the kitchen. Hedgespeth agreed to front Herndon $1,900 for one ounce of cocaine. At approximately 3:30 a.m., Herndon delivered the cocaine to Triplett's hotel room.

Herndon was subsequently arrested and indicted on several drug-related counts. Bailey fled the jurisdiction and was not located until after Herndon's trial had commenced. Anticipating that the government intended to use co-conspirator statements at trial, Herndon requested a hearing pursuant to *United States v. Enright*, 579 F.2d 980 (6th Cir.1978) (requiring a hearing to decide whether the statements of a co-conspirator should be admitted). In addition to the evidence discussed above, Hedgespeth testified at the *Enright* hearing that when they first entered the Roadhouse, they asked Kim, a Roadhouse employee, where they could obtain cocaine. She informed them that her supplier's name was Bill and that he was currently in Florida. Bill Herndon was in Florida when Kim made the statement. Kim also told Hedgespeth that Bill left his supply with another person to distribute in his absence. At the completion of the hearing, the district court held that a preponderance of the evidence supported the conclusion that a conspiracy between Herndon and Bailey existed.

The trial began on October 28, 1996. At the end of the government's case, defense counsel moved for a judgment of acquittal on several of the substantive counts. The district court denied the motions. During the jury deliberations following the two-day trial, the jury foreman sent a note to the judge stating that "Juror # 1 now believes he may have had dealings with the defendant (in the defendant's home), approximately 4 years ago. # 1 does not believe that this impacts his ability to act as a juror." The judge returned a note to the jury, requesting them to continue deliberating. Defense counsel objected to the judge's response. The court revealed the name of juror # 1 and noted that the juror sold security systems. Defense counsel then requested to interview the juror, which the district court rejected. All of the jurors had been asked during voir dire whether they knew Herndon, and none responded affirmatively.

The following day, defense counsel informed the court that Herndon had decided not to "make a motion." After the jury returned a guilty verdict, defense counsel made a motion for a new trial. The district court rejected Herndon's request for a new trial in a Memorandum Opinion and Order filed on January 17, 1997. The district court's opinion relied on the fact that the juror's note indicated uncertainty that he had had dealings with Herndon, and certainty

that he could be impartial. The district court also rejected defense counsel's motion for a new trial based on the sufficiency of the evidence to convict Herndon on Counts 1, 3, 4, and 7.

Herndon renewed his motion for a new trial at the sentencing hearing held on February 18, 1997. At that time, the district court permitted Herndon and Bill Stone, the co-owner of the Roadhouse, to "make a record" as to their recollection of the business dealings with juror # 1. Both Stone and Herndon testified they believed that the juror had attempted to sell a security system to the Roadhouse when it first opened in 1991. It was the only time that a security salesman had called at the Roadhouse. Stone had experience with security systems, because prior to opening the bar he was in the security alarm business. Herndon and Stone recalled that the salesman's security system was overpriced, and that the salesman grossly exaggerated the equipment costs in order to profit from the transaction. After Herndon and Stone refused to purchase the system and informed the salesman that his prices were inflated, the salesman remained in the bar and became intoxicated. Herndon and Stone testified that they had asked the salesman to leave the Roadhouse because of his "belligerent" conduct. At the close of Stone's testimony, the district court denied Herndon's verbal request for a new trial, in part because it believed that the decision not to move for a mistrial was based on trial strategy. This appeal followed.

## II. ANALYSIS

On appeal, Herndon raises the same five issues he raised in his Motion for New Trial below. They are as follows:

1. The district court erred in admitting the statements of Bailey as a co-conspirator.

2. The district court erred in failing to grant an acquittal on Count 1 (conspiracy to possess with intent to distribute cocaine, and aiding and abetting the same).

3. The district court erred in failing to grant an acquittal on Counts 3 and 4 (possession with intent to distribute cocaine, and aiding and abetting the same).

4. The district court erred in failing to grant an acquittal on Count 7 (carrying a firearm in relation to a drug-trafficking crime).

5. The district court erred in refusing Herndon's request to question a juror who during deliberations revealed for the first time that he may have had prior business dealings with Herndon.

■ As to the first issue concerning the admission of Bailey's statements as a co-conspirator, this court has previously held that a district court's factual findings made in the course of analyzing Rule 801(d)(2)(E) of the Federal Rules of Evidence will not be disturbed unless they are clearly erroneous. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir.1992). A finding of fact is clearly erroneous when, although there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). On the other hand, we review the district court's ultimate decision to admit the co-conspirator's statements into evidence pursuant to Rule 801(d)(2)(E) *de novo*. *Gessa*, 971 F.2d at 1261.

■ As to the next three issues regarding the sufficiency of the evidence to sustain Herndon's convictions on Counts 1, 3, 4, and 7, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is not necessary that the evidence exclude every "reasonable hypothesis except that of guilt." *United States v. Townsend*, 796 F.2d 158, 161 (6th Cir.1986).

For the reasons set forth in the district court's Memorandum Opinion and Order denying Herndon's Motion for New Trial (entered on January 17, 1997), we find that the district court properly admitted Bailey's statements pursuant to Rule 801(d)(2)(E), and concur in its rulings as to the sufficiency of the evidence to convict Herndon on Counts

1, 3, 4, and 7. No jurisprudential purpose would be served in repeating the district court's well-reasoned discussion of these first four issues herein.

On the other hand, we find that the district court erred in refusing Herndon's request to question the juror who remembered during deliberations that he may have had prior business dealings with Herndon. After learning of the relationship, defense counsel requested an opportunity to interview the witness for possible bias. The court rejected counsel's request and ordered the jurors to continue deliberating. Specifically, the district court stated, "I'm not going to withdraw the case, and this is my judgment." After conferring with Herndon, defense counsel refrained from moving for a mistrial. Counsel explained that without knowing the relationship between the juror and Herndon, the defense could not make a good faith motion for a mistrial based on juror bias. *See United ed States v. Moore*, 917 F.2d 215, 220 (6th Cir.1990) ("A defendant may move for a mistrial where there is a *legitimate* claim of seriously prejudicial error." (emphasis added)). Notwithstanding the defense's request, the district court refused to permit a hearing.

## A. Standard of Review

■ The government argues that the district court's denial of Herndon's motion for a new trial should be reviewed for "plain error" because Herndon failed to move for a mistrial. Under the plain error standard of review, this court will reverse the lower court only if it finds that the trial was " 'so infected with error' [that] the trial judge and prosecutor were derelict in countenancing it." *United ed States v. Glover*, 846 F.2d 339, 344 (6th Cir.1988) (quoting *United States v. Hook*, 781 F.2d 1166, 1172–73 (6th Cir.1986)); *see United ed States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (providing a thorough discussion of the plain error analysis).

■ Herndon, on the other hand, argues that the district court's denial of his motion for a new trial should be reviewed for "abuse of discretion." The abuse-of-discretion standard of review may be applied only when the district court was *on notice* of the alleged

error. *See United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir.1987) ("[I]mplicit in our use of the abuse of discretion standard ... is a recognition that the trial judge ... was on notice of an objection to the use of [the] testimony."). It is axiomatic that the district court must first have an opportunity to exercise its discretion before this court can review the same for possible abuse. *Id.* (observing that an objection "is the only way an abuse-of-discretion standard of review could be properly used"). In this case, defense counsel made an objection, placing the district court on notice that Herndon desired to interview juror #1. Despite defense counsel's failure to make a motion for mistrial, the district court was on notice of Herndon's objection and exercised its judgment in rejecting the same. Consequently, we will review the district court's denial of Herndon's motion for a new trial under the abuse-of-discretion standard.

## B. Internal Versus Extraneous Influence

■ Having considered the proper standard of review, we must now determine whether the influence on juror #1 was internal or extraneous. Rule 606(b) of the Federal Rules of Evidence prohibits a juror from

> testify[ing] as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except* that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

FED. R. EVID. 606(b) (emphasis added).

In *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court provided examples of both internal and extraneous jury influences. Examples of internal influences include the behavior of jurors during deliberations, the jurors' ability to hear or comprehend trial testimony, and "physical or mental incom-

petence of a juror." *Id.* at 118, 107 S.Ct. 2739 (citing *United States v. Dioguardi*, 492 F.2d 70 (2d Cir.1974)). The Court noted that the "internal processes of the jury" generally constitute internal influences. *Id.* at 120, 107 S.Ct. 2739. In contrast, *Tanner* gave the following as examples of extraneous influences: a juror in a criminal trial who had previously applied for a job in the district attorney's office (citing *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)), a bribe attempt on a juror (citing *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)), and newspaper articles and media attention (citing *United States v. Thomas*, 463 F.2d 1061 (7th Cir.1972)). *Id.* at 117–18, 107 S.Ct. 2739.

In the instant case, the government argues that juror # 1's recollection that he might have had previous business dealings with Herndon constitutes an internal influence. In support of its argument, the government analogizes the present case to *United States v. Rigsby*, 45 F.3d 120 (6th Cir.1995). The juror in *Rigsby* believed that "she might know some of the witnesses" in a criminal trial. *Id.* at 122. Defense counsel had not questioned the jurors during voir dire about their knowledge of the witnesses. When the juror brought her knowledge to the attention of the judge and parties, defense counsel *"never unequivocally requested the court to conduct an evidentiary hearing* and did not make a motion for a mistrial," but counsel did suggest that the district court inquire about which witnesses the juror knew. *Id.* at 125 (emphasis added). The district court did not conduct such an investigation, and the defendant was convicted. On appeal, the defendant challenged the district court's failure to investigate. This court affirmed the decision of the district court, holding that no further inquiry into the juror's knowledge of any of the witnesses was necessary because the juror's statement was tentative, defense counsel failed to clearly object, and the trial was in an intimate rural community. *Id.* at 125. The *Rigsby* court failed to state whether the potential influence on the juror was deemed internal or extraneous.

While the government contends that the *Rigsby* court must have implicitly found that

the influence on the jury was internal because it did not require a hearing, we find it unnecessary to resolve that question because of the many distinctions between *Rigsby* and the present case. While the main similarity is the tentative knowledge of the juror in question, the allegation in the instant case is that the juror was familiar with a *party* rather than a *witness*. The testimony of both Herndon and Stone, moreover, indicates that the juror may have had a negative experience during his interaction with Herndon. The *Rigsby* court also relied on the likelihood that in small communities a juror may know someone testifying at the trial. In the instant case, however, there was apparently no problem in selecting jurors who were not familiar with Herndon. In addition, defense counsel in *Rigsby* did not "unequivocally" request a hearing, whereas Herndon specifically requested a hearing and an opportunity to interview the juror. Finally, counsel in *Rigsby* failed to ask the jurors during voir dire whether they were familiar with any of the witnesses, while in the instant case the jurors had been asked whether they knew Herndon.

■ In contrast, the Supreme Court in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), held that a juror in a criminal trial who had submitted a job application to the local district attorney's office was influenced by extraneous information. The Court held "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215, 102 S.Ct. 940. A new trial will not be necessary every time a question of juror partiality is raised. *Id.* at 217, 102 S.Ct. 940. Where a colorable claim of extraneous influence has been raised, however, a *"Remmer* hearing" is necessary to provide the defendant with "the opportunity to prove actual bias." *Id.* In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), a juror was offered money in exchange for a favorable verdict. The Court held that a hearing was required to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial." *Id.* at 230, 74 S.Ct. 450.

In *United States v. Perkins,* 748 F.2d 1519 (11th Cir.1984), a case factually similar to the case at bar, a juror failed to reveal during voir dire that he had served on a committee with the defendant and thus personally knew him. After the trial was completed, several jurors expressed doubts to defense counsel about the guilty verdict. Other jurors commented that the juror in question was "especially committed to return a 'guilty' verdict." *Id.* at 1529–30. The district court in *Perkins* conducted a hearing and interviewed the jurors. After the hearing, the district court denied the defendant's motion for a new trial. On appeal, the Eleventh Circuit stated that "[e]xtrinsic evidence, evidence that has not been subject to the procedural safeguards of a fair trial, threatens such constitutional safeguards as the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 1533. Ultimately, the Eleventh Circuit, after considering all of the evidence introduced concerning the juror's statements, determined that the extraneous information might have influenced the verdict. It therefore remanded the case for a new trial. *Id.* at 1534.

█ From *Tanner, Smith,* and *Perkins,* we distill the principle that an extraneous influence on a juror is one derived from specific knowledge about or a relationship with either the parties or their witnesses. This knowledge or relationship is such that it taints the deliberations with information not subject to a trial's procedural safeguards. These types of influences, moreover, may well deny the litigants their constitutional right to have the case heard by a fair and impartial jury. We thus conclude that juror # 1's recollection that he may have had prior business dealings with Herndon raises such concerns and constitutes an extraneous influence. Such an extraneous influence in the instant case has all the more potential for harm because the juror's putative knowledge relates to a party rather than to a witness.

## C. Duty to Investigate

█ After determining that the alleged influence on juror # 1 was extraneous, we must now consider what actions are required of the district court to investigate the allega-

tion. Outlining the procedure for considering a question of juror bias, this court has explicitly held that "the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality." *United States v. Pennell,* 737 F.2d 521, 532 (6th Cir.1984). In addition, this court warns that "[p]rejudice is not to be presumed." *Id.* In *United States v. Zelinka,* 862 F.2d 92 (6th Cir.1988), this court extrapolated the following four points from *Pennell:*

> (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the *"Remmer* hearing" is not inherently suspect.

*Id.* at 95–96; *see United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir.1985) ("When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the sixth amendment.").

█ Another key point in *Shackelford* is that "[a] trial court's refusal to permit an evidentiary hearing may constitute abuse of discretion when the alleged jury misconduct involves extrinsic influences." *Id.; see United States v. Brantley,* 733 F.2d 1429, 1439 (11th Cir.1984) ("A party claiming that an improperly influenced jury returned a verdict against him must be given an opportunity to prove that claim.") (quoting *United States v. Forrest,* 620 F.2d 446, 457 (5th Cir.1980)).

In the instant case, Herndon alleges that the district court abused its discretion by refusing to allow him to question a juror who was potentially influenced by extraneous information. While the district court did not permit Herndon to question the juror, it allowed him to "make a record" during the sentencing hearing about the potential relationship between Herndon and the juror. During this testimony, Herndon and Stone testified that a security system salesperson attempted to sell the Roadhouse an overpriced security system. They both recalled that the same salesperson proceeded to drink

heavily and was ejected from the bar for disorderly conduct. In addition, they both testified that only one security salesperson ever attempted to sell a system to the Roadhouse. After this testimony, defense counsel renewed his previously rejected motion for a new trial. The district court denied the motion without initiating a hearing or conducting an investigation.

We conclude that the district court abused its discretion by denying Herndon a meaningful opportunity to prove actual bias. *See United States v. Walker,* 1 F.3d 423 (6th Cir.1993) (remanding the case for a new trial and finding that the defendants were "deprived of the opportunity to meet their burden of proving actual juror bias" because the judge did not ask the jurors whether their exposure to a transcript containing unredacted portions of video depositions would affect their ability to be impartial, even though the judge interviewed each juror to find out how the transcript was used).

■ As stated above, the district court has a duty to investigate this type of claim, and if the allegation is of an extraneous influence, then the district court should have conducted a *Remmer* hearing. While this court affords broad discretion to the district court in determining the type of investigation necessary to determine juror bias, the district court must provide the defendant a meaningful opportunity to prove the same. *United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir.1985) ("Since the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion."). While the government argues that the trial judge did provide a hearing by permitting Herndon and Stone to testify at the sentencing hearing, the record clearly indicates that the judge was not conducting an investigation of the allegation. The judge simply permitted Herndon to "make a record" for the purpose of appeal. Permitting the defense to make a record for appeal does not discharge the district court's duty to investigate claims of juror misconduct.

The government's additional claim that defense counsel could have subpoenaed the juror is not convincing. The district court had already denied a defense request to interview the juror, and the record indicates that the purpose of the hearing scheduled on February 18, 1997 was for sentencing, rather than for a meaningful *Remmer* hearing.

■ Finally, the district court, in its Memorandum Opinion and Order, abused its discretion in relying on the assurance of impartiality contained in the note passed to the judge, in part because the author of the note was not juror # 1. Instead, the *jury foreman* wrote the note to the court, stating that juror # 1 could remain unbiased. Only the juror who actually experienced the extraneous influence can vouch for his or her ability to be impartial. But even if juror # 1 had written the note himself, this would still have been insufficient to ensure his impartiality without further inquiry. In the present case, the judge not only failed to adequately investigate the allegation of juror partiality, but the juror never personally assured the court of his impartiality.

### D. Remedy

■ Having concluded that the district court abused its discretion by denying Herndon the opportunity to question juror # 1, we must still consider the impact of this error on Herndon's right to a fair trial. Because the risk of prejudice is so great when a jury is tainted with extraneous information, we believe that Herndon should have the opportunity to establish whether prejudice existed. Accordingly, we vacate Herndon's conviction and sentence and remand the case for a *Remmer* hearing in which Herndon will have an opportunity to prove actual bias. *See, e.g., United States v. Bowie,* 892 F.2d 1494, 1502 (10th Cir.1990) (vacating a sentence and remanding a case for a hearing to determine whether an attorney's conflict of interest prejudiced the defendant, and instructing the district court to grant a new trial if prejudice is found or reinstate the conviction if no prejudice is found); *McCoy v. Goldston,* 652 F.2d 654, 659–60 (6th Cir.1981) (remanding a case after the jury reached a verdict for further proceedings to determine if defen-

dant was prejudiced as a result of a juror's omission of relevant information during voir dire).

### III.  CONCLUSION

For the reasons discussed above, we VACATE Herndon's conviction and sentence and REMAND the case for a hearing to determine if Herndon was prejudiced by the juror's belated acknowledgment that he may have had prior dealings with Herndon. If prejudice is found, Herndon will be entitled to a new trial; otherwise, his conviction and sentence should be reinstated.