**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0576n.06

**No. 07-6315**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 18, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **RODNEY MAYS,** | ) | |
| | ) | |
| *Petitioner-Appellant,* | ) | |
| | ) | On Appeal from the United |
| v. | ) | States District Court for the |
| | ) | Eastern District of Kentucky |
| **LARRY CHANDLER, Warden,** | ) | |
| | ) | |
| *Respondent-Appellee.* | ) | |
| | ) | |

**BEFORE:** COLE and COOK, Circuit Judges; COHN, District Judge.[*]

**COHN, District Judge.** This is a habeas case under 28 U.S.C. § 2254. A Clay County, Kentucky, grand jury indicted Petitioner-Appellant Rodney Mays (Appellant) and Donald Simmons for the shooting murder of Curtis Smith. They were tried together to a jury. Appellant was convicted as the principal actor in Smith's death and sentenced to life imprisonment. Simmons was convicted of accomplice liability and sentenced to twenty years in prison.

Appellant challenges Respondent-Appellee Larry Chandler, Warden (Appellee), on the three issues identified in Part I. The district court denied relief on all issues. As explained below, we AFFIRM.

**I. ISSUES ON APPEAL**

Appellant raises three issues on appeal:

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

(1) Whether the Kentucky Supreme Court's holding on direct appeal that the trial court did not err in failing to conduct a *Remmer*[1] hearing after counsel for Appellant informed the judge that a juror had unauthorized communication with Smith's mother during trial is contrary to and/or an unreasonable application of clearly established federal law;

(2) Whether the Kentucky Court of Appeal's holding on collateral appeal that Appellant was not prejudiced by his trial counsel's failure to object to a detective's testimony that he believed Simmons's version of events over Appellant's is contrary to and/or an unreasonable application of clearly established federal law; and

(3) Whether the Kentucky Supreme Court's holding on direct appeal that the Appellant was not prejudiced by the prosecutor's referring to him as a "lowlife coward" during closing arguments is contrary to and/or an unreasonable application of clearly established federal law.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The shooting

The account of the shooting is adapted from the Kentucky Supreme Court's summary, supplemented by other parts of the record. On the evening of February 6, 1997, Appellant, Simmons, and Smith went to Britton Branch, a remote section of Clay County, where they built a fire and drank alcohol. Shortly thereafter, Smith was shot and killed. The police found his body the following day and questioned Appellant and Simmons about the death. Both told the police that they left Smith on the side of the road on the way to Britton Branch and had not seen him again.

One year later, on February 26, 1998, while in jail for driving under the influence, Simmons contacted the police and gave them a recorded statement of his version of what happened to Smith. Simmons said he, Appellant, and Smith had been driving around while drinking and taking Xanax.

---

[1] *Remmer v. United States*, 347 U.S. 227 (1954).

They stopped at Stevie Collins's game room. Appellant went inside while Simmons and Smith waited in the car. Upon Appellant's return, the three drove to a house where they knew they could purchase more liquor and drugs. As they were walking toward the house, Appellant told Simmons that Collins had offered to pay him $5,000 to kill Smith.[2] Thereafter, the three men went to Britton Branch. After building a fire by the road, Appellant went to the car and turned on some music. When he returned, he stood directly behind Smith, shot him in the back of the head, and then fired the remaining rounds from the gun into Smith's body.

According to Simmons, Appellant then reloaded the pistol and forced him at gunpoint to help remove and destroy some of Smith's clothing and throw Smith's body over a hill. The two men then returned to Collins's game room where Appellant collected $5,000, gave Simmons $1,000, and told him what he should tell the police if he was questioned.

On April 7, 1998, the police interrogated Appellant, who gave a different version of the events. In a recorded statement, Appellant admitted that Collins had offered to pay him $5,000 to kill Smith. Initially Appellant agreed, and Collins gave him a gun. Appellant said he then changed his mind, and Collins then threatened to kill him. Appellant further claimed that before the drive to Britton Branch he told Simmons about his conversation with Collins.

At this point the stories diverged. Appellant told the police that Simmons shot Smith, then gave the gun to Appellant and ordered him to shoot Smith as well. Appellant denied throwing

---

[2] Simmons told the police he did not believe Appellant.

Smith's body over the hill. According to Appellant, he and Simmons returned to the game room where Appellant collected the $5,000 and gave Simmons $2,000.

Appellant told a different story at trial. He testified that Simmons and Smith had been arguing throughout the night. According to Appellant, Simmons had been having an affair with Smith's wife and was angry at Smith for having hit her; further, Smith owed Simmons a substantial sum of money. Appellant said that after the three arrived at Britton Branch, he went to the car to play some music. He heard gun shots and when he returned he found Smith slumped over dead. Simmons then forced Appellant to shoot Smith's dead body and threatened him not to tell the police.

## B. The trial

### 1. *Juror contact with Smith's mother*

During trial, the following colloquy took place at the bench:

> [Appellant's Counsel]: Before we get started on something else. It's come to my attention that there was a conversation in the hallway between the lady you just spoke to [juror] and the blond headed lady and the two women in the red back there in the back. I believe one of them is Mr. Smith's mother.
>
> [Prosecutor]: Who . . .?
>
> [Appellant's Counsel]: The blond headed lady that just spoke up and the two ladies there dressed in red.
>
> By the Court: I'll inquire into that at some point in time. Let's proceed.

The court never addressed the issue again during trial.

### 2. *Detective Hopkins's testimony*

Detective Hopkins testified that he believed Simmons's 1998 account of what had happened:

Q: So you felt at that point, regardless of the statement he'd given you back February 7th [1997], you felt he was telling you the truth now, is that correct?

A: That's right.

. . . .

Q: Now, when he made the prerecorded statement to you on February 26th, the one that led you to make the tape recorded statement, did you feel that he was being evasive at that point?

A: No.

Q: When he gave you the tape recorded statement itself, did you feel he was being evasive about anything?

A: No, not really.

. . . .

Q: And you felt he was telling you the truth?

A: I did.

Detective Hopkins then testified that he believed Appellant was not being truthful in his 1998 statement:

Q: During the time that you actually recorded the statement, you continually asked Mays we just want you to be honest; we just want you to tell the truth. Why did you keep asking him that or telling him that.

A: Well, just to, just to impress upon him that's what we want, good or bad, you know I don't care what it is, just tell us the truth; that's what we deal with. We deal with the truth.

Q: And when you would say this to him during those times, did you feel that some of the statements he was giving you were still not the truth?

A: Sometimes.

Q: Okay did you feel when he was telling you he didn't have any memory of what was going on, they just went out there, next thing he knows they are back at Stevie Collins' pool hall that that wasn't being truthful.

A: Yes, I did feel that that wasn't being truthful.

Appellant's counsel did not object to this testimony, although he did object to related questions on at least two occasions during the prosecutor's examination of Detective Hopkins.

### 3. The prosecutor's comment

The prosecutor included the following in his closing argument:

Ladies and gentlemen murder is crying out in this Courtroom right here today and tonight; it's crying out. That's what they did to Curtis Smith in the worst of all possible forms. Take money, to take a friend under the pretense of going to party with him and execute him. He didn't even have a chance. What a coward! What cowards, what lowlife cowards; they can't stand up and face somebody man to man.

### 4. Appellant's motion for a new trial

After the jury returned a guilty verdict, Appellant moved for a new trial but did not state as a ground the court's failure to hold a hearing on the alleged contact between a juror and Smith's mother as described above.

## C. The appeals

### 1. State appeals

#### a. Direct appeal

The Supreme Court of Kentucky affirmed Appellant's conviction on direct appeal. Concerning the alleged juror misconduct, the state supreme court said:

During the course of the trial, counsel for Mays approached the trial judge and advised that it "had come to [his] attention" that one of the jurors had been

- 6 -

conversing with two women dressed in red, one of whom was believed to be the victim's mother. The trial judge responded that he would inquire into that at some point in time. Defense counsel did not request a hearing, an admonition, or a mistrial. If a party desires a ruling or some other affirmative action on the part of the trial judge, it is his duty to insist on a ruling and failure to do so constitutes waiver of the issue. *Bell v. Commonwealth*, Ky., 473 S.W.2d 820 (1971). It was never confirmed that either of the two women in red actually spoke to a juror; or, if so, that one of them was the victim's mother; or, if so, that they were conversing about the trial.

The trial judge admonished the jury before each recess that they were not to talk to anyone about the case. In the absence of any contrary evidence, jurors are presumed to adhere to that admonition. *Tamme v. Commonwewalth*, Ky. 973 S.W.2d 13, 26 (1998), *cert. denied*, 525 U.S. 1153 (1999).

Concerning the prosecutor's closing argument, the court said:

[W]e are unpersuaded that the prosecutor's use of the term "low life coward" warrants reversal for a new trial. While we have condemned prosecutorial references to an accused in scurrilous and degrading terms, *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 412 (1987), *cert. denied*, 490 U.S. 1113 (1989), the focus on appeal is on "the overall fairness of the trial." *Id.* Courts have allowed references to the defendant as a "crazed animal," *Dean v. Commonwealth*, Ky., 844 S.W.2d 417 (1992), *cert. denied*, 512 U.S. 1234 (1994), a "beast," *Koonce v. Commonwealth*, Ky., 452 S.W.2d 822 (1970), and "worse than all of the 'criminals' and 'traitors' in hell." *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir. 1979), *cert. denied*, 444 U.S. 936 (1979). Recognizing the broad latitude which is afforded counsel during closing argument, we are unable to conclude that this isolated remark by the prosecutor denied Mays his right to a fair trial.

b.      *Collateral appeal*

Appellant then filed a motion to vacate in a collateral proceeding in Clay Circuit Court under Kentucky Rule of Criminal Procedure 11.42. He argued eight claims of error, including ineffective assistance of counsel based on the failure to request a hearing on the alleged extraneous juror contact; appointed counsel supplemented his *pro se* pleadings. After an evidentiary hearing, the circuit court denied the motion by written order without an opinion. Appellant appealed the denial

to the Kentucky Court of Appeals on the sole issue that he was denied effective assistance of counsel due to his trial counsel's failure to object to Detective Hopkins's testimony that he believed Simmons's version of the murder over Appellant's.

The Kentucky Court of Appeals found that Detective Hopkins's testimony was inadmissible and should have been objected to: "Generally, a witness may not vouch for the truthfulness of another witness." The court went on to note that after a hearing, Appellant's trial counsel appeared to recognize the "flagrant inadmissibility" of Detective Hopkins's testimony and acknowledged that, in hindsight, he should have been more aggressive in objecting to the testimony.

However, the state appellate court reasoned that Appellant had not met the second, prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984):

> For several reasons the record demonstrates that there is not a reasonable probability that but for Det. Hopkins's impermissible testimony the jury would have believed Mays's version of events concerning who shot Smith or Simmons's version. First, though it had been over a year since the murder and it appears that Mays and Simmons were no longer under active investigation for the crime, Simmons voluntarily came forward and gave a statement to the police in which he admitted being present at the time of the crime and receiving a portion of the alleged payoff by Collins. Simmons's trial testimony was consistent with his police statement. He accounted for coming forward when he did to remorse over his involvement in the crime, and accounted for his delay in coming forward to his fear of Mays and Collins.

> Mays, on the other hand, did not voluntarily come forward with a statement to police. His April 7, 1998, statement to police was a product of Simmons's confession to involvement in the crime. In his April 7, 1998, statement, Mays corroborated Simmons in almost all respects except concerning who did the shooting. Mays admitted that Collins made the proposal to him, that Collins gave him the gun to carry out the killing, that he received the payoff for the killing, and that he kept the greater share of the $5,000.00 payoff. The only significant deviations from Simmons's account was that Mays changed his mind about going through with the killing, and that Simmons himself then, to Mays's distress, carried out the killing.

Perhaps because he realized the inculpatory nature of his April 7, 1998, statement and its failure to account for a motive for Simmons to follow-through with the killing after Mays had changed his mind, at trial Mays renounced his April 7, 1998, statement and for the first time attributed Simmons's motive for killing Smith to an alleged affair between Simmons and Brenda Smith, to Simmons's distress at Smith having allegedly beaten Brenda and scarred her face, and to the substantial drug debt Smith allegedly owed to Simmons. At trial Simmons and Brenda Smith both denied having engaged in an affair.

Mays attributed his April 7, 1998, statement to police coercion. Mays alleged that police told him what to say in his statement, and even stopped, rewound, and paused the tape recorder to get the statement they wanted. According to Mays, in order to get him to say what they wanted, police deprived him of food and water, deprived him of bathroom privileges, made promises to him that he would be released if he gave the statement they wanted, and made threats concerning his wife and family. Mays further alleged that Det. Hopkins physically choked him in order to obtain the statement. Despite these allegations of coercion, however, we note that Mays does not cite us to or reference any motion to suppress the statement on the basis of this coercive conduct.

Based on the foregoing, in order for the jury to have accepted Mays's version of events, it would have had to have discounted that Simmons was remorseful over the crime; it would have had to have believed that Simmons concocted his entire story, which implicated a prominent Clay County businessman, concerning a murder for hire; it would have had to have believed that Simmons and Brenda Smith were having an affair and that Smith owed Simmons a substantial drug debt; it would have had to have believed that the affair and drug debt were a sufficient motive for Simmons to have killed Smith; and it would have had to have believed that the police coerced Mays's April 7, 1998, statement, even to the point of physically choking him into making the statement.

Because of his changing and inconsistent stories and his attempt to attribute his April 7, 1998, statement to egregious police coercion, Mays's credibility was severely challenged even without Det. Hopkins's improper testimony. While it is possible that Det. Hopkins's testimony vouching for the credibility of Simmons over Mays may have swayed the jury to believe Simmons's version of events in favor of Mays's version of events, we do not believe that this possibility is a probability sufficient to undermine confidence in the outcome of the proceeding considering the totality of the evidence before the jury. As such, Mays has failed to establish prejudice from trial counsel's failure to object to Det. Hopkins's testimony concerning the truthfulness of the two defendants.

*Mays v. Chandler*
No. 07-6315

Thus, the Kentucky Court of Appeals affirmed the denial of Appellant's post-conviction challenge. The Supreme Court of Kentucky denied discretionary review.

### 2. *Petition for writ of habeas corpus*

Appellant then filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Kentucky. He claimed seven errors, including the three at issue in this appeal. A magistrate judge recommended that the district court deny Appellant's application for the writ and grant Appellee's motion to dismiss. The magistrate judge further recommended that the district court refuse a certificate of appealability on all issues except the *Remmer* hearing. The court accepted the magistrate judge's recommendations and denied Appellant's petition.

## III. BASIS FOR APPELLATE JURISDICTION

The district court exercised jurisdiction under 28 U.S.C. § 2254. This court has jurisdiction under 28 U.S.C. § 2253(c), expanded the district court's certificate of appealability to the three issues identified in Part I above, and appointed counsel for Appellant.

## IV. ANALYSIS

### A. Standard of review

Federal habeas review of a state court decision is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006). Under the AEDPA, a writ of habeas corpus shall not issue on any claim that was tried on the merits in State court proceedings, unless adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This court must give deference to questions of fact, while questions of law are reviewed *de novo*.  § 2254(e)(1); *Dyer*, 465 F.3d at 284; *Hodge v. Hurley*, 426 F.3d 368, 375–76 (6th Cir. 2005).  Under the "contrary to" prong, this court must grant Appellant's application for a writ of habeas corpus if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  Under the "unreasonable application" prong, this court must grant habeas relief if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to facts of the prisoner's case."  *Id.*  Unreasonable application includes improperly refusing to apply clearly establish federal law where circumstances demand.  *Id.*  However, this court may not issue a writ simply because it concludes in its independent judgment that the state court decision applied a Supreme Court case incorrectly.  *Price v. Vincent*, 538 U.S. 634, 641 (2003).  Rather, it is Appellant's burden to show that the state court applied the Supreme Court case in an objectively unreasonable manner.  *See id.*

**B.     The trial court's failure to conduct a *Remmer* hearing**

Due process requires that a defendant in a criminal case be tried fairly by a panel of impartial, "indifferent" jurors.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *United States v. Walker*, 160 F.3d

1078, 1083 (6th Cir. 1998). When a party alleges that a jury has been subjected to outside influence, the trial court should hold a hearing with all interested parties. *Remmer v. United States*, 347 U.S. 227, 229–30 (1954); *Walker*, 160 F.3d at 1083. This court "require[s] a *Remmer* hearing in all cases involving an unauthorized communication with a juror . . . from an outside source that presents a likelihood of affecting the verdict." *United States v. Rigsby*, 45 F.3d 120, 123 (6th Cir. 1995). A trial court has a duty to investigate a credible allegation of extraneous influence "sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." *Id.* at 124–25. This duty holds even when a defendant does not expressly request a *Remmer* hearing at trial. *See United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000). The trial court has discretion in deciding the type of investigation necessary to determine juror bias but "must provide the defendant a meaningful opportunity to prove the same." *United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998).

The record shows that while a concern about the juror contact was raised at trial, Mays did not request a hearing, admonishment, or mistrial. The Kentucky Supreme Court confirmed that Appellant did not request any action from the trial court and observed that failure to insist on a ruling is a waiver under Kentucky law. *Bell v. Kentucky*, 473 S.W.2d 820, 821 (Ky. 1971). We agree with Appellee that the Kentucky Supreme Court held that Appellant waived his right to appeal this issue by failing to explicitly request a *Remmer* hearing. Moreover, we note that Appellant did not raise the issue of counsel's failure to request a hearing on his collateral appeal to the Kentucky Court of Appeals, an appeal that was based on ineffective assistance of counsel.

Even if the Kentucky Supreme Court stopped just short of explicitly stating that Appellant waived the issue under Kentucky law, as the magistrate judge and district court found, the facts here are very different from those in *Remmer*, *Herndon*, and *Corrado*, upon which Appellant relies.

In *Remmer*, a juror who later became the jury foreman reported to the trial judge that someone tried to bribe him to return a verdict favorable to the defendant. 347 U.S. at 228. The judge informed the prosecutor and requested an investigation by the Federal Bureau of Investigation; together they later concluded the statement was made in jest. *Id.* The defendant did not learn of the extraneous juror contact until after the jury convicted him. *Id.* The Supreme Court observed that "[t]he sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror . . . unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder." *Id.* at 229. The Court went on to hold that ex parte final action by the trial court was inappropriate "on information such as was received in this case," *id.* at 229–30, and that the trial court should have held a hearing "with all interested parties permitted to participate," *id.* at 230.

During jury deliberations in *Herndon*, the jury foreman sent a note to the judge stating that a juror believed he may have had business dealings with the defendant in the past but the juror did not think this would affect his ability to act as a juror. 156 F.3d at 632. The trial judge replied with a note requesting that the jury continue deliberating. *Id.* Defense counsel objected and asked to interview the juror; the judge denied the request. *Id.* The next day defense counsel told the court that the defendant had decided not to move for a mistrial. *Id.* The jury returned a guilty verdict and the trial court denied defendant's motion for a new trial. *Id.* The defendant renewed his motion for

a new trial at a sentencing hearing. *Id.* at 633. The trial court permitted the defendant and a business associate to make a record of their recollections of business dealings with the juror. *Id.* They said the juror came into their bar five years earlier and tried to sell them a security system but they declined because the system was overpriced. *Id.* They said the juror stayed in the bar and got drunk, and they asked him to leave because of his belligerent conduct. *Id.* The court then denied the defendant's oral request for a new trial, partly because the court thought the earlier decision not to move for a mistrial was a trial strategy. *Id.* The government argued that the trial judge provided a *Remmer* hearing when it permitted the defendant and his business associate to testify. *Id.* at 637. A panel of this court rejected the government's argument and held that "[p]ermitting the defense to make a record for appeal does not discharge the district court's duty to investigate claims of juror misconduct." *Id.*

In *Corrado*, someone approached the defendant two days before closing arguments and offered to influence a "friend" on the jury in exchange for money. 227 F.3d at 532–33. The man said he could guarantee a hung jury and his friend was sure he could bring two or three other jurors along with him. *Id.* at 533. Defense counsel immediately informed the district court and the government. *Id.* The defendant met with the individual at the behest of federal agents and tried, unsuccessfully, to elicit the name of the juror. *Id.* The judge decided to ask the jury three "yes/no" questions in open court concerning attempts to influence them and their impartiality, and allow them to retire for fifteen minutes to "reflect." *Id.* at 534. If the answer to any question was "yes," the juror would be instructed to send the judge a note and then be called in to answer questions from the judge and both parties. *Id.* Defense counsel objected to the proposal and suggested he would move for

a mistrial; the judge said he would not grant the motion based on the information presently known. *Id.* The court proceeded with the plan and no juror sent a note to the judge. *Id.* The jury returned a guilty verdict and the defendant moved for a new trial. *Id.* This court held that, despite the fact that the defendant did not expressly request a *Remmer* hearing, the district court should have held a hearing because it was fully aware of the nature of the claims of juror tampering and defense counsel stated objections to the court's three-question proposal. *Id.* at 536.

Here, unlike in *Remmer*, Appellant was aware of the possible juror contact during trial. And although he brought the situation to the court's attention during trial, he did not request a hearing or mistrial. In contrast to *Herndon* and *Corrado*, Appellant had no prior negative business dealings with a juror or a colorable claim of jury tampering resulting in an FBI investigation—nor did he offer any other similar claim of prejudice. Rather, Appellant's counsel reported to the trial court that a juror may have had contact in the hallway with someone who might have been Smith's mother. Such a vague allegation does not constitute a colorable claim of extraneous juror contact like those in *Remmer*, *Herndon*, and *Corrado*—and Appellant's failure to raise the issue again at trial underscores this fact. Under these circumstances, we cannot say that the Kentucky Supreme Court unreasonably applied clearly established United States Supreme Court precedent.

## C.    The testimony of Detective Hopkins

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland*, 466 U.S. at 687; *Washington v. Hofbauer*, 228 F.3d 689, 702 (6th Cir. 2000). A criminal defendant is entitled to a new trial due to ineffective assistance of counsel where (1) trial counsel's performance was deficient and (2) there is a reasonable probability that the deficiency

adversely impacted the outcome of the trial. *Strickland*, 466 U.S. at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

There is no dispute that Appellant's trial counsel was objectively deficient. The Kentucky Court of Appeals determined that Detective Hopkins's testimony was inadmissible testimony to which Appellant's counsel should have objected. Although Appellant meets the first prong of *Strickland*, however, we cannot say that the state appellate court applied the second prong unreasonably to the facts of this case. The state court of appeals concluded that Appellant was not prejudiced because the jury would not have believed his testimony even in the absence of the improper testimony by Detective Hopkins. Specifically, the appellate court pointed out that:

(1) Simmons came forward voluntarily;

(2) His trial testimony was the same as in his pre-trial statement to the police;

(3) He explained his delay in coming forward as fear of Appellant and Collins; and

(4) Appellant's trial testimony was inconsistent with his pre-trial statement to the police.

Further, the court reasoned, in order to have accepted Appellant's version of events, the jury would have had to believe:

(5) Simmons owed a drug debt to Smith;

(6) Simmons was having an affair with Smith's wife; and

(7) Appellant's first statement was the result of police coercion.

Appellant cites several cases for the proposition that clear prejudice occurs where the key issue is the credibility of the witnesses and there is no significant evidence. All are distinguishable from the facts here. *Hodge v. Hurley* was a case of alleged rape of a three-year-old in which the

prosecutor "repeatedly commented on the credibility of witnesses" throughout closing arguments. 426 F.3d 369, 372, 377 (6th Cir. 2005). This court noted that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 378 (internal quotation marks omitted) (quoting *United States v. Young*, 470 U.S. 1, 18–19 (1985)). Here, it is Detective Hopkins's opinion, not the prosecutor's, that is at issue. Further, the *Hodge* prosecutor compounded his misconduct by "repeatedly" and "blatantly" misrepresenting the evidence. *Id.* at 380. No such misrepresentation is alleged here.

In *Cooper v. Sowders*, a case involving the stabbing murder of a taxi driver, a police witness expressly stated that all of the evidence pointed to the defendant as the perpetrator; the trial judge referred to the police witness as an "expert" in whether or not to arrest someone; and another witness testified to his own credibility. 837 F.2d 284, 285, 287–88 (6th Cir. 1988). This court held that the cumulative effect of the three errors resulted in a trial that was fundamentally unfair. *Id.* at 286. The testimony of Detective Hopkins as to whether he believed Simmons and Appellant when they were giving their 1998 statements, while inadmissible, was far less egregious than the point-blank testimony—declared "expert" by the trial judge—of the detective in *Cooper* that "[t]he only evidence we found that would link anyone to this crime would be Mr. Cooper." *Id.* at 287.

In *Brown v. Smith*, this court held that the defendant was prejudiced by his trial counsel's failure to investigate and obtain records related to his teenaged daughter's counseling sessions, where the records would have undermined her credibility as a witness in his trial for sexually molesting her and there was no other evidence against him. 551 F.3d 424, 425 (6th Cir. 2008). Here, in contrast,

key evidence, as elucidated by the Kentucky Court of Appeals, was introduced in addition to Detective Hopkins's testimony.

Moreover, and quite significantly, in neither *Hodge* nor *Cooper* nor *Brown* did the defendant give trial testimony that conflicted with his own earlier statement to police, as did Appellant.

Appellant says that without a police detective's repeatedly vouching for Simmons's veracity, there is a reasonable probability that a juror would have found Appellant guilty of the lesser offense, as the jury was permitted to find both defendants guilty without naming one as the principal if they could not determine who was telling the truth. Appellant ignores the existence, let alone the weight, of the other evidence that the state appellate court highlighted: Simmons came forward voluntarily; his trial testimony was consistent with his 1998 statement to the police; he explained his delay in coming forward as fear of Appellant and Collins; and Appellant's trial testimony was inconsistent with his 1998 statement to the police.

We agree with the magistrate judge and district court that the Kentucky Court of Appeals identified the correct federal standard regarding prejudice and applied it reasonably in an analysis that was "thorough, well-supported, and convincing."

**D.     The prosecutor's comment**

The relevant question concerning the prosecutor's referring to Appellant and Simmons as "lowlife cowards" during closing argument is whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). We agree with the state and district courts that this "isolated comment" did

not.  And, even aside from the fact that "the accumulation of non-errors cannot collectively amount to a violation of due process," *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) (internal quotation marks omitted) (quoting a magistrate judge's report and recommendation), in light of the evidentiary record as discussed in Part IV.C, the cumulative effect of Detective Hopkins's testimony and the prosecutor's comment did not result in a trial that was fundamentally unfair to Appellant.

## V.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of habeas relief to Appellant.

**COLE, Circuit Judge, concurring**. Though the trial court could have been clearer, I agree with the majority's conclusion that the Kentucky Supreme Court held that Appellant waived his right to appeal this issue by failing to insist that the trial court take any further action after counsel raised the specter of extraneous juror influence. *See Scott v. Mitchell*, 209 F.3d 854, 864-65 (6th Cir. 2000). Appellant does not argue that his counsel rendered ineffective assistance by failing to request a *Remmer* hearing, admonishment, mistrial, new trial, or otherwise objecting to the impaneled jury. Rather, Appellant asserts that the trial court's failure to address the issue was a structural error, and that no Kentucky procedural rule can relieve the trial court of its federal constitutional duty to investigate. Because we have held that appellants waived their right to appeal a trial court's failure to hold a *Remmer* hearing by failing request a hearing, admonishment, mistrial, or new trial, I disagree. *See United States v. Perry*, 438 F.3d 642, 651(6th Cir. 2006); *United States v. Walker*, 160 F.3d 1078, 1083-84 (6th Cir. 1998); *see also United States v. Vining*, 224 F. App'x. 487, 493-94 (6th Cir. 2007); *United States v. Reeves*, No. 99-1248, 2000 WL 687649, at *2 (6th Cir. May 19, 2000). It is for this reason that I believe Appellant has procedurally defaulted this claim.

However, I write separately because I disagree with the majority's conclusion that Appellant's allegation of extraneous juror contact was so vague that it did not constitute a colorable claim requiring a *Remme*r hearing. In my view, had counsel preserved federal habeas review, Appellant raised a colorable claim of extraneous juror contact requiring a *Remmer* hearing.

A trial court confronted with an allegation of extraneous juror influence must conduct a *Remmer* hearing. *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995). A defendant is not automatically entitled to such a hearing, and he or she must first "raise[] a 'colorable claim of

extraneous influence.'" *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (quoting *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999)). An "extraneous influence" is "one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Vining*, 224 F. App'x. at 493 (quoting *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998)).

> At trial, Appellant's counsel informed the trial court:
>
> It's come to my attention that there was a conversation in the hallway between the lady you just spoke to [juror] and the blond headed lady and the two women in the red back there in the back. I believe one of them is Mr. Smith's mother.

(Joint Appendix ("JA") 148-49.) As Appellant notes, counsel gave the trial court all the information within his knowledge that an improper communication likely had occurred. Specifically, defense counsel provided: (1) "the identity of the juror at issue;" (2) "a physical description of the women" involved; (3) "an assertion that one of these women was the victim's mother;" and (4) "the location of the communication." (Reply Br. of Petitioner-Appellant 7.) Moreover, counsel notified the court of this extraneous contact immediately after it occurred. Defense counsel did what it could, it alerted the trial court almost immediately of jurors' possible contact with the victim's mother. There can be little doubt that a conversation between the victim's mother and a juror is the type of inappropriate communication that raises the specter of extraneous juror influence. *See United States v. Hall*, 455 F.3d 508, 521-22 (5th Cir. 2006); *Jones v. Kassulke*, No. 95-6459, 1997 WL 664774, *2 (6th Cir. Oct. 23, 1997); *Commonwealth v. Silvia*, No. 07-P-940, 2009 WL 7709, at *2 (Mass. App. Ct. Jan. 2, 2009). This is especially true where, as was the case here, the trial occurred in a small town where those associated with the trial were likely to know one another. Although the trial

judge said he would inquire into the matter later, he never did so, and only the judge was in a position to make such an inquiry.

The majority believes, however, that Appellant should have done more. In support of its decision that Appellant was required to provide more information to raise a colorable claim of extraneous juror contact, the majority attempts to distinguish Appellant's case from *Remmer*, *Herndon*, and *Corrado*, where courts concluded that the trial court erred in failing to hold a *Remmer* hearing. In my view, the majority's position is not well taken. Notably, in each of the aforementioned cases, someone privy to the extraneous juror communication came forward to report the details of the encounter to the court. In *United States v. Remmer*, the jury foreman told the trial judge that someone tried to bribe him to acquit the defendant. 347 U.S. 227, 228 (1954). In *Herndon*, the jury foreman sent a note to the judge disclosing that he may have had prior business dealings with the defendant. 156 F.3d at 632. In *United States v. Corrado*, defense counsel informed both the prosecution and the district court that someone approached the defendant indicating he could influence a juror. 227 F.3d 528, 532-33 (6th Cir. 2000).

Here, no one who was privy to the conversation between the victim's mother and a juror, and possible two other persons, came forward. Put simply, only the trial court was in a position to gather more information; we should not penalize Appellant for the court's failure to develop the record when it was the court, not the counsel, who were in a position and had a duty to inquire further. Additionally, requiring Appellant to provide information detailing the communication, where such information was not at his disposal, is tantamount to requiring him to prove prejudice *before* obtaining a *Remmer* hearing. This certainly cannot be the desired rule in a situation like this one.

Finally, to hold a defendant to such a high standard runs afoul of the trial court's duty to ensure that a defendant has an impartial and fair jury.

A trial court, in its discretion, must determine what steps, if any, are required to make certain that a jury's impartiality has not been compromised. *Rigsby*, 45 F.3d at 124. Improper contact with a juror about a matter pending before the jury is presumptively prejudicial. *Remmer*, 347 U.S. at 229. "When there is a credible allegation of extraneous influences, the [trial] court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." *Rigsby*, 45 F.3d at 124-25. In this case, there is no suggestion that trial counsel's assertions lacked credibility. Thus, a hearing was necessary to determine the exact nature of the contact before the trial court could determine whether the jurors' contact with the victim's mother had the potential to create a bias.

We are not in a position to review whether the trial court properly exercised its discretion in this case because even that court did not know the nature of the communication. Moreover, without sufficient details about the communication, we cannot review whether the trial court's remedy, if any, was appropriate. *See Davis*, 177 F.3d at 557 (noting that without the benefit of a hearing delving into the extent to which an extraneous comment affected the juror's deliberations, neither the district court nor this court has any basis for concluding that the extraneous communications were harmless).